IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**FERNANDO VELÁSQUEZ III**,

    Petitioner,

    v.

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.

Civil No. 20-1354 (BJM)

## **OPINION AND ORDER**

Fernando Velásquez III ("Velásquez") seeks review of the Social Security Administration Commissioner's ("Commissioner's") finding that he is not entitled to disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 423. Velásquez contends that the Administrative Law Judge ("ALJ") erred at step five in finding that there were jobs in the national economy that he could perform. ECF Nos. 1, 19. The Commissioner opposed. ECF Nos. 16, 20. This case is before me on consent of the parties. ECF Nos. 5, 7-9. After careful review of the administrative record and the briefs on file, and for the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## **STANDARD OF REVIEW**

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Sec'y of Health & Hum. Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C.§ 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Sec'y of Health & Hum. Services*, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence means "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citation omitted).

The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Sec'y of Health & Hum. Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner employs a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; see *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Goodermote v. Sec'y of Health & Hum. Services*, 690 F.2d 5, 6-7 (1st Cir. 1982). At step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in Appendix 1 of the regulations, impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to step four, at which point the ALJ assesses the claimant's residual functional capacity ("RFC") and determines whether the claimant's impairments prevent the claimant from doing the work he has performed in the past.

An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final step asks whether the claimant can perform other work

available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Rodríguez v. Sec'y of Health & Hum. Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Sec'y of Health & Hum. Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Sec'y of Health & Hum. Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following is a summary of the treatment record, consultative opinions, and self-reported symptoms and limitations as contained in the transcript ("Tr.") of the record of proceedings.

Velásquez was born on September 23, 1968, has a GED, can communicate in English, and last worked as a warehouse clerk and as a handyman until he stopped working on March 30, 2016 (alleged onset date) at age 47 due to a broken left ankle ligament, a left knee condition, depression, and anxiety. Velásquez applied for disability benefits on October 4, 2016.[1] He last met the insured status requirement on March 31, 2017 (date last insured). Tr. 21, 40-41, 55, 60, 64, 100, 240-241, 273-276.

*Medical Background*

**Dr. Norberto Báez-Ríos (orthopedic surgeon)**

A note dated October 19, 2016, indicates that Velásquez, then forty-eight years old, had severe left knee pain. Diagnoses included bursitis, effusion, degenerative joint disease, chondromalacia of the patella, patella tenderness, and leg weakness and cramps due to a severe lumbar condition. Dr. Báez noted that Velásquez needed a specialist for severe lumbar condition, a left knee MRI, and physical therapy. Tr. 382.

---

[1] The ALJ's decision states that Velásquez filed for disability insurance benefits on September 9, 2016, (Tr. 21) but an application notice states that the application was completed on October 4, 2016. Tr. 240.

**Dr. Santiago Rivera-Ortega (general practitioner)**

An SSA form contains Dr. Rivera's contact information and a handwritten note that reads "2014 – Present" but offers no treatment evidence. Tr. 360.

August to November 2016 progress notes indicate that Velásquez had lumbago and left ankle degenerative joint disease and pain. Velásquez weighed between 185-200 pounds and his body mass index ("BMI") was between 29.9 and 31.3. The rest of the handwriting is illegible. Tr. 388-391.

Dr. Rivera submitted to the SSA, Office of Hearings and Appeals, a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)," dated January 9, 2017. Dr. Rivera handwrote that Velásquez had a left ankle deformity but could ambulate with an assistive device (cane). Dr. Rivera check-marked that Velásquez could occasionally and frequently lift and/or carry less than ten pounds, stand and/or walk for less than two hours in an eight-hour workday and medically required a hand-held assistive device to ambulate, sit for less than six hours and had to periodically alternate sitting and standing to relieve pain and discomfort, and could do limited pushing and/or pulling with his lower extremities. He could occasionally kneel and crouch, but never climb ramps/stairs/ladders/ropes/scaffolds, balance, crawl, or stoop. Velásquez had no manipulative limitations (he could unlimitedly reach in all directions, handle, finger, and feel) or visual/communicative limitations (he could see, hear, and speak). He had no environmental limitations. Tr. 384-387.

An August 24, 2017, left ankle MRI showed advanced degenerative changes of the ankle joint in combination with osteoarthritis, arthropathy changes, and abnormal mechanics related to lateral hindfoot impingement, likely due to a chronic ankle ligamentous injury.

In July 2018, Dr. Rivera diagnosed Velásquez with pain in the left knee, ankle and joints, hypercholesterolemia, thoracic and low back pain, cervicalgia, left knee unilateral primary osteoarthritis, and generalized anxiety disorder. Medications were prescribed (Relafen, Parafon Forte DSC, Pepcid, Gabapentin, Anaprox, Atorvastatin Calcium). Tr. 91-92.

Progress notes from October 26, 2018, show that Velásquez was alert, oriented, active, and showed no acute distress. He had a BMI of 30.34, blood pressure of 148/90, and a pain level of three on a scale of ten. Velásquez had left knee and ankle pain with limited range of movement ("ROM") and used a cane for walking. Review of all physical systems was normal. Psychiatric evaluation was normal. Dr. Rivera assessed derangement of posterior horn of medial meniscus due

to an old tear or injury of the left knee, and pain in the left ankle and foot joints. Notes indicate that an orthopedist recommended knee replacement surgery and that he still needed an evaluation by an orthopedist for his left foot and ankle. Dr. Rivera prescribed medications and recommended that Velásquez do diet and physical activity, avoid gaining weight or doing impacted exercises, use an assistive device such as a cane, and take non-steroidal anti-inflammatory drugs. Tr. 88-91.

Dr. Rivera submitted another "Medical Source Statement of Ability to Do Work-Related Activities (Physical)," dated November 6, 2018. Dr. Rivera handwrote that Velásquez had severe left knee degenerative joint disease due to osteoarthritis. He could not flex his left knee due to limited ROM and had to use a cane to keep balance and avoid injury of his left knee and ankle and a knee brace to support the knee joint. Dr. Rivera check-marked that Velásquez could occasionally lift and/or carry less than ten pounds (did not check-mark any of the options for frequent lifting/carrying), stand and/or walk for less than two hours in an eight-hour workday and medically required a hand-held assistive device to ambulate, sit for less than six hours and had to periodically alternate sitting and standing to relieve pain and discomfort, and do limited pushing and/or pulling with his lower extremities. He could occasionally crawl but never climb ramps/stairs/ladders/ropes/scaffolds, balance, kneel, crouch, or stoop. Velásquez had no manipulative limitations (he could unlimitedly reach in all directions, handle, finger, and feel) or visual/communicative limitations (he could see, hear, and speak). He did not have environmental limitations but for temperature extremes because he could not tolerate working in a cold environment because it worsened his left knee and ankle pain. He could maintain attention and concentration on work tasks. Tr. 421-425.

Progress notes from April 12, 2019, indicate that Velásquez reported a lot of pain in his left knee and ankle with ROM limitations and pain to palpation. Left knee and foot extension was limited. Review of all systems was normal. He had a "smooth gait and upright posture." He was oriented, alert, active, with no acute distress. Judgment and insight were normal. His recent and remote memory were intact. His mood and affect were appropriate. Same diagnoses and prescriptions as in 2018 remained. Tr. 94-99.

**Procedural History**

Along with his application for disability benefits (Tr. 240-241), Velásquez filed a series of disability reports at the initial and reconsideration/appeals levels. Velásquez claimed that he could no longer work because of a broken left ankle ligament, a left knee condition, depression, and

anxiety. He did not claim in these reports changes or worsening of his conditions or daily activities. Tr. 273-279, 312-318, 334-340.

In a face-to-face interview with Velásquez on October 21, 2016, Velásquez complained of severe left knee and ankle problems. The interviewer observed that Velásquez used a cane, had difficulty standing and walking, and seemed to have a severe limp, but noted that Velásquez was "exessively [sic] dramatic about his condition." Velásquez was also observed driving himself to the appointment, getting out of his vehicle without problem, walking straight and without a cane until he approached the office. Tr. 271. The case was referred to the disability investigations unit for "[s]uspected exaggerated and dramatic behavior during in office interview." Officers went to his house and video-recorded the visit. Velásquez was observed bending over, without any apparent difficulty, to put on his sneakers. He exited the house balcony and walked towards the front gate without the use of a cane or visible brace but did limp and was observed putting all his weight on one leg. He was cooperative, able to concentrate and adequately answer questions. Tr. 393-398.

In function reports Velásquez filed at the initial and reconsideration levels, he claimed that he felt pain in his left ankle, left knee, and lumbar region, which caused inability to walk, stand, or sit comfortably for more than thirty minutes. Tr. 280, 324. His daily activities included caring for his personal needs, taking care of his dog, sitting on the porch a few minutes at a time, laying down often, and going to medical appointments. The pain impedes him from sleeping through the night, and he had problems getting dressed, washing his back, and sitting on and getting up from the toilet. Tr. 281, 325. The pain also impeded him from doing chores. Tr. 282, 326. He drove and could go out alone. He could go shopping and manage funds. Tr. 283, 327. Velásquez claimed that his conditions affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, concentrate, and get along with others. He could walk for twenty to thirty minutes before needing to stop and rest for five to ten minutes. He could follow written and spoken instructions and pay attention for twenty to thirty minutes before pain interrupted his concentration. He claimed not being able to finish what he started. Tr. 285, 329. He claimed not being able to engage in his hobbies (gardening, snorkeling, watching movies) because of their physical nature. Although irritable, he could spend time with others (visits, talking on the phone, sitting on the porch) and went to church twice a week. Tr. 284, 328-329. He got along well with authority figures but got frustrated by miscommunications. A disagreement at a former job with Human Resources led to a verbal argument and his firing. He did not handle stress well. He also used a cane, brace, and

glasses. Tr. 286, 330. He took medications for inflammation and cholesterol, which did not cause side effects. Tr. 287.

A consultative evaluation was performed by Dr. Rafael Sanz-Sein (physical medicine and rehabilitation) on February 13, 2017. Dr. Sanz diagnosed left ankle sprain with a possible ligament tear, left knee osteoarthritis, and lumbar strain. Upon examination, Velásquez was alert and oriented, and he would answer questions in a coherent and cooperative manner. He weighed 203 pounds and measured 5'6". Dr. Sanz noted that Velásquez used a cane on the right hand and a brace over the left knee. Dr. Sanz found left ankle edema and mild deformity. There was tenderness to palpation over the lumbar paraspinal muscles, left knee medial epicondyle, left ankle medial and lateral malleolus, and dorsal foot area. He had full muscle strength in the neck, shoulder, elbow, wrist, hands, hip, and right knee and ankle areas. In the left knee and ankle muscle strength was four out of five with pain. ROM was normal, except for limited back and left knee flexion and left ankle flexion/extension. Hand function was normal. Tr. 399-404. A left knee x-ray showed lateral subluxation of the tibia with narrowing of the medial knee joint compartment related to osteoarthritis changes and undersurface patellar spurs. Tr. 406. A left ankle x-ray showed rotation and medial subluxation of the mortise joint with associated small calcifications at the medial aspect of the ankle joint that may be correlated with avulsion injuries. Advanced osteoarthritis of the mortise joint was noted. Orthopedic evaluation was advised. Tr. 407. A lumbosacral spine x-ray showed grade-II anterolisthesis of L5 on S1, bilateral narrowing of the neural foramina. Spondylosis was suggested. There was also mild levorotoscoliosis of the lumbar spine and straightening of the normal lumbar lordosis that could be correlated to a muscle spasm. Tr. 408.

As to functional capacity, Dr. Sanz assessed that Velásquez could walk, stand, and sit. His gait was antalgic, protecting the left ankle and knee. Velásquez could walk without the cane. The use of an assistive device was for safety purposes due to left knee and ankle pain. He could stand on toes and heels but had difficulty walking that way due to the left ankle pain. Dr. Sanz noted that Velásquez was able to get on and off from the exam table by himself. He could also use both hands to grip, grasp, pinch, finger tap, oppose fingers, button a shirt, and pick up a coin. Tr. 400-402.

Dr. Sanz's report additionally contains the following information related to treatment history and activities of daily living. Velásquez reported having twisted his left ankle in 2011 and gradually felt worse. In April 2016, his low back and left knee also got worse. Dr. Báez, orthopedic surgeon, recommended knee arthroplasty/replacement. Velásquez had not had physical therapy or

surgeries. Velásquez claimed not being able to return to work since August 2016 due to aches and pains. He could independently do activities of daily living such as use the toilet, feed, shower, get dressed, but needed assistance sometimes with lower body dressing. He also drove himself to the appointment. Tr. 399.

Consultative expert ("CE") Dr. Beatriz Trujillo-Miranda, psychiatrist, evaluated Velásquez on February 21, 2017, and diagnosed major depression, recurrent, moderate. "The claimant presents an affected prognosis, as he presents episodes of anxiety, sadness, irritability, concern, mood swings, and behavioral changes." He was able to manage his goods and money. Tr. 78, 84. As to Velásquez's past medical history, he claimed suffering from pain in his ankles, knees, back, and neck; was under treatment of a primary care physician (Dr. Santiago) and took muscle relaxants but did not remember the names of the medications; and was not under psychiatric treatment at the time and had no history of psychiatric hospitalizations. Velásquez reported feeling nervous and depressed, and having issues with insomnia, tiredness, irritability, mood swings, and problems concentrating, remembering, and handling pressure and stress. He spent his day at home resting and watching television. He had limited social contact. His wife took care of the household chores, cooked for him, and made sure he took his medications and went to his medical appointments. Tr. 78-80.

Upon evaluation, Dr. Trujillo noted that Velásquez was forty-eight years old, 5'6" tall, and weighed 200 pounds. Velásquez looked sad, anxious, and anguished. His psychomotor activity seemed decreased, and his affect was labile. His personal appearance was clean and simple, he was cooperative, his verbal expression was clear, and he was logical, coherent, and relevant in his responses. During the tests for concentration and attention, Velásquez looked attentive, but he was not able to complete subtraction in series. During the evaluation for cognitive functions, he was oriented in person, time, and place. During the memory tests (immediate, short-term, recent, and long-term), he showed a decreased level of concentration and attention. His long-term memory looked diminished. His judgment was good and his insight was adequate. Tr. 81-82. His general knowledge was adequate for his level of education. He was able to perform simple math calculations. He was able to complete the test of opposite words but not of interpreting sayings. Tr. 82.

Dr. Florentino Figueroa assessed on March 6, 2017, that Velásquez had a medically determinable impairment of significant structural damages on the left ankle as evidenced by the x-

rays requested by SSA. The x-rays did not support Velásquez's allegation of a ligament condition. The record also contained evidence of left knee osteoarthritis and lumbar spine degenerative changes and spondylolisthesis. And although the consultative evaluation recommended the use of a cane, there was evidence that he was able to walk without it, such as the video of Velásquez talking with an investigator. The impairments did not meet or equal an applicable listing, and Dr. Figueroa assessed the following RFC. Velásquez could occasionally (cumulatively 1/3 or less of an eight-hour workday) lift and/or carry (including upward pulling) twenty pounds and ten pounds frequently, stand and/or walk for four hours and required a cane for uneven terrains, sit for about six hours, and limited pushing and/or pulling with his lower left extremity. Velásquez also had postural limitations. He could occasionally climb ramps/stairs/ladders/ropes/scaffolds, balance, stoop (bend at the waist), kneel, crouch, or crawl. He had no manipulative, visual, communicative, or environmental limitations. Tr. 110, 113-115.

Dr. Hugo Román-Rivera assessed on March 7, 2017, that Velásquez had a mild depressive disorder which did not meet the diagnostic criteria of Listing 12.04. His limitations to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage himself were mild. Dr. Román further found that there was no evidence of mental health treatment and the evidence reviewed supported a not-severe rating because the primary functional limitations were physical. Tr. 111.

The claim was denied on March 9, 2017, with a finding that the evidence on record supported a finding that his conditions affected his ability to perform some work-related duties but did not preclude him from performing other jobs. Tr. 60, 118, 144-145. BMI at the time was 29.4. Tr. 100. Dysfunction of major joints and back disorders (discogenic and degenerative) were found to be severe impairments, while depression was a non-severe impairment. Tr. 110. The Disability Determination Explanation indicates that Velásquez was found to have the RFC to perform sedentary work and was not limited to unskilled work because of his impairments and could perform jobs available in significant numbers in the national economy, such as doing surveillance through closed circuit television monitors, registration clerk, and telecommunicator. Tr. 116. Velásquez requested reconsideration. Tr. 148-149.

On May 16, 2017, Dr. Janice Calderón, psychologist, reviewed the record and affirmed the initial assessment as written, finding no new evidence or worsening of symptoms. Tr. 126. Dr. Calderón assessed that while his functions reports described lack of concentration and being less

social, Velásquez's primary limitations were physical due to chronic pain. The evidence supported a finding of a non-severe mild depressive disorder. Tr. 128-129.

On May 26, 2017, Dr. Magda Rodríguez affirmed Dr. Figueroa's RFC assessment as written. Tr. 127, 130-132.

On May 26, 2017, the claim was denied on reconsideration, affirming the initial denial of benefits as written. Tr. 64, 126, 128, 133, 135, 148-149.

Velásquez requested a hearing before an ALJ (Tr. 156), and informed that his conditions had not changed since his March 2017 disability report. Tr. 335.

A hearing was held before ALJ Judith Torres-De Jesus on May 8, 2019. Velásquez testified that he hurt his ankle at home and didn't tend to it because he did not have medical insurance. He got his ankle checked when his knee started hurting as well. In March 2016 he could no longer work because he was unable to walk, stand, or sit for long period of time. Velásquez testified that he could sit comfortably between ten to fifteen minutes and had to leave his left leg extended or elevated, as instructed by a doctor. After that, he would start fidgeting or had to get up. He could stand for five to ten minutes, tops fifteen minutes. He could walk half-a-block or 200 feet. Since 2016, he used an ankle brace, a knee brace, and a cane, as prescribed by a doctor. When walking, he could not bend his knee because he felt pain or sliding. His ankle locked at times to the point where he could not put pressure on his foot. Velásquez further testified that knee surgery was being considered by his doctors, but not ankle surgery because the damage is beyond repair. He took medications for inflammation, nerve pain, sleeping, and cholesterol. Some of the side effects included stomach issues and an ulcer, drowsiness, and fogginess. His wife would help him up from bed and to the bathroom because he could not put his foot down. She also helped him get dressed and makes him breakfast. He would sit, lie down, and walk around the house during the day. He could not help with house chores or yard work or taking care of their two dogs. He drove short distances, but the sitting position caused his ankle to lock up and he would have to pull over. He would go to church twice a week and would be able to stand at will to stretch his leg. He socialized in person with family and friends, and through social media on his phone or tablet. His wife did the shopping and paid the bills. As to an emotional condition, Velásquez testified being reluctant to seek help but noticed that he was not as pleasant to be around as before. Tr. 40-53.

Dr. Luis Canepa, psychiatrist and medical expert ("ME"), testified that Velásquez was diagnosed by the CE with moderate major depressive disorder, recurrent, but since Velásquez was

not in treatment, the condition was not severe. Dr. Canepa further testified that, with treatment, there was a high possibility of improvement. Dr. Canepa considered Listing 12.04 and testified that Velásquez was mildly limited as to B criteria. Tr. 54-55.

Dr. Marieva Puig, vocational expert ("VE"), testified that Velásquez worked as a handyman or "construction repairer," and warehouse clerk, both of medium exertional level. The VE asked if a person with Velásquez's same age, education, work history, and the following limitations could work: lift, carry, push, pull twenty pounds occasionally and ten pounds frequently; sit for six hours in an eight-hour workday; stand and walk for four hours; climb ramps and stairs occasionally; never climb ladders, ropes, and scaffolds; balance frequently; stoop and kneel occasionally; never crouch or crawl; never work at unprotected heights; and occasionally work with moving mechanical parts and operating a motor vehicle. The VE answered that such a person could not because the prior occupations had a much higher exertional level, but that he could do less than a full range of light occupations. The VE mentioned unskilled sedentary jobs such as envelope addresser (DOT code 209.587-010, with 95,000 positions available nationwide and 815 positions available in Puerto Rico), charge account clerk ( DOT code 205.367-014, with 130,000 positions available nationwide and 610 in Puerto Rico),  and weight tester (DOT code 539.485-010, with 86,000 positions available nationwide and 500 in Puerto Rico). Tr. 55-56.

The ALJ added to the hypothetical the use of a cane for uneven terrain outdoors. The VE answered that the sedentary occupations mentioned applied. Counsel for Velásquez asked if the VE's testimony stilled applied if the claimant had to also use a cane on even terrain. The VE answered that if he had to use the cane all the time, the cane would then be considered a hand-held assistive device, eroding the occupational base of sedentary occupations. Tr. 56-57.

Counsel also asked for testimony regarding having to have the leg lifted at all times. The VE answered that such a person would need a protected or sheltered work environment that allowed changes in position and would not be able to perform the jobs mentioned.  Tr. 57-58.

Counsel asked if a person that could only stand or walk for less than two hours and sit for less than six hours could do the jobs mentioned. The VE testified that he would not because, being considered less than the full range of sedentary jobs, there were no jobs in the economy. Tr. 58.

On June 4, 2019, the ALJ found that Velásquez was not disabled under sections 216(i) and 223(d) of the Act. Tr. 21-31. The ALJ sequentially found that Velásquez:

(1) had not engaged in substantial gainful activity since his alleged onset date of March 30, 2016, through his date last insured of March 31, 2017 (Tr. 23);

(2) had severe impairments: broken left ankle ligament, left knee degenerative joint disease, and lumbar spondylosis (Tr. 23);

(3) did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526), particularly listings 1.02 and 1.04 (Tr. 25);

(4) could not perform past relevant work because he retained the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) with the following additional limitations: lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently; sit for six hours and stand or walk for four hours in an eight-hour workday; occasionally climb ramps and stairs, stoop, and kneel; frequently balance; never climb ladders, ropes, or scaffolds; never crouch or crawl; never work at unprotected heights; and occasionally work exposed to moving mechanical parts and operating a motor vehicle. He should use a cane for outdoors, uneven terrain (Tr. 26); and

(5) through the date last insured and considering Velásquez's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Velásquez could perform. Tr. 29.

The ALJ found that the mental impairments of depression and anxiety did not cause more than minimal limitation in Velásquez's ability to perform basic mental work activities and were therefore non-severe. Tr. 23.

On May 30, 2020, the Appeals Council denied Velásquez's request for review of the ALJ's decision, rendering the ALJ's decision the final decision of the Commissioner. Tr. 1-4, 237-238. The present complaint followed. ECF No. 1.

## DISCUSSION

This court must determine whether there is substantial evidence to support the ALJ's determination at step five that Velásquez had the RFC to perform other work in the national economy. Velásquez argues that the ALJ failed in not having a medical advisor present at the hearing to testify about his physical conditions and need for a cane, erred in relying on the VE's testimony, made lay person medical conclusions, formulated the RFC on her own, and made an RFC finding that was not supported by substantial evidence. Velásquez also questions what constitutes significant numbers in the national economy.

In reviewing the record for substantial evidence that supports or not the ALJ's sequential evaluation findings, I am mindful that the claimant is responsible for providing the evidence of an impairment and its severity; the ALJ is responsible for resolving any evidentiary conflicts and determining the claimant's RFC. 20 C.F.R. § 404.1545(a)(3); *see also Tremblay v. Sec'y of Health & Human Servs.*, 676 F.2d 11, 12 (1st Cir. 1982) (citing *Richardson v. Perales*, 402 U.S. 389 (1971)). A medically determinable impairment or combination of impairments "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1521. It "must be established by objective medical evidence from an acceptable medical source," and cannot be based on a claimant's "statement of symptoms, a diagnosis, or a medical opinion." *Id.* "Objective medical evidence means signs, laboratory findings, or both." 20 C.F.R. § 404.1502(f). "Signs means one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [symptoms]." 20 C.F.R. § 404.1502(g). "Laboratory findings means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques." 20 C.F.R. § 404.1502(c). "Diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X–rays), and psychological tests." *Id.*

In this case, there was no ME at the hearing to testify about Velázquez's physical conditions. The ALJ did use a ME at the hearing for Velásquez's mental conditions. I understand the value of having a medical expert testify at the hearing for Velásquez's mental conditions, considering there is no evidence on record of treatment for his depression and anxiety other than observations by doctors treating his physical conditions and a consultative evaluation by a psychiatrist hired by the agency. It touches on the need to resolve any potential evidentiary conflict because the Commissioner "retains a certain obligation to develop an adequate record from which a reasonable conclusion can be drawn." *Carrillo Marín v. Sec. of Health and Human Services*, 758 F.2d 14, 17 (1st Cir. 1985). Plus, Social Security Administration, Hearings, Appeals, and Litigation Law Manual (HALLEX) § I-2-5-34(A) specifies when the ALJ <u>must</u> obtain a ME opinion (not discretionary) and when the ALJ <u>may</u> obtain a ME opinion (discretionary). HALLEX § I-2-5-34(A)(1) specifies that the ALJ must obtain a ME opinion, either in testimony at a hearing or in responses to written interrogatories, when considering finding if a claimant's impairment(s)

medically equals a listing. ME Dr. Canepa testified Velásquez's mental condition was not severe and, after considering Listing 12.04, opined that Velásquez was mildly limited as to B criteria. This testimony was relevant to the ALJ's step two and three findings regarding Velásquez's mental conditions. The use of a ME at the hearing to testify about Velásquez's mental conditions was proper.

However, the ALJ was not obliged to use a ME to testify about Velásquez's physical conditions. HALLEX § I-2-5-34(A)(2) states that a ME opinion may be obtained to supplement the record throughout the sequential evaluation process in determining, for example, the severity of an impairment, to determine whether a claimant's impairments meet a listing, to clarify clinical or laboratory findings, to offer an opinion about functional limitations and abilities as per the record. The record contains Dr. Figueroa's and Dr. Román's assessments that Velásquez did not meet or equal Listing 12.04. The record also contains evidence of Velásquez's knee and ankle impairments and the use of a cane, and assessments regarding their impact on his RFC for the ALJ's consideration (to be discussed next). Thus, "[t]he ALJ neither overlooked any expert opinion concerning the matter nor was obliged as a matter of law to call an expert." *Davis B. v. Berryhill*, No. 1:18-cv-00009-LEW, 2019 U.S. Dist. LEXIS 20806, at *6 (D. Me. Feb. 8, 2019) (quoting HALLEX § I-2-5-34(A)(2); *DuBois v. Berryhill*, No. 1"17-cv-00076-JDL, 2017 U.S. Dist. LEXIS 198784, at *3 (D. Me. Dec. 3, 2017) (rec. dec., *aff'd* Feb. 28, 2018)).

As to the ALJ's RFC finding, the ALJ may rely on a VE's testimony. The ALJ is required to express a claimant's impairments in terms of work-related functions or mental activities, and a VE's testimony is relevant to the inquiry insofar as the hypothetical questions posed by the ALJ to the VE accurately reflect the claimant's functional work capacity. *Arocho v. Sec'y of Health and Human Services*, 670 F.2d 374, 375 (1st Cir. 1982). In other words, a VE's testimony must be predicated on a supportable RFC assessment. *See* 20 C.F.R. § 404.1520(g)(1). Because "a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Id.* Also, when determining which work-related limitations to include in the hypothetical question, the ALJ must: (1) weigh the credibility of a claimant's subjective complaints, and (2) determine what weight to assign the medical opinions and assessment of record. *See* 20 C.F.R. §§ 404.1527, 404.1529. And, an RFC assessment is "ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (*citing* 20 C.F.R. §§ 416.927(e)(2), 416.946). So,

Velásquez's argument that the ALJ formulated an RFC assessment on her own as to the use of a cane (ECF No. 19 at p. 5) fails because the ALJ and only the ALJ is directed and required to do so by regulation. Also, Velásquez's assertion that the ALJ's hypothetical questions were unspecific and suggestive (ECF No. 19 at p. 6) fails because they include the limitations set forth by the ALJ in the RFC of less than a full range of light work. But, it is this court's duty to determine whether there is substantial evidence to support the ALJ's RFC assessment and step five finding.

The record, which is short and clear as to Velásquez's complaints, diagnosed physical conditions, treatments, and medical assessments, supports this RFC finding portion. The ALJ noted that all evidence after the date last insured of March 31, 2017, was irrelevant because Velásquez had to show he was disabled before then. Tr. 27. The ALJ, and I, note that the bulk of the record evidence pertains to a period outside the date for disability purposes. Tr. 28. But even that evidence supports the ALJ's RFC finding.

Velázquez reported to Dr. Sanz having twisted his left ankle in 2011, but there is no medical evidence of treatment on the record until 2016, although there's a note that states that treatment with Dr. Rivera started in 2014. Velásquez suffered from untreated continuous severe left ankle and knee pain until he eventually sought treatment. Dr. Rivera started treating Velázquez's pain with medications in 2016. In October 2016, Dr. Báez, orthopedic surgeon, diagnosed a series of conditions (bursitis, effusion, degenerative joint disease, chondromalacia of the patella, patella tenderness, and leg weakness and cramps due to a severe lumbar condition) and opined that Velásquez needed to see a specialist for a severe lumbar condition and needed an MRI and physical therapy for his left knee. There is no evidence in the record that those things happened. Orthopedic evaluation was again advised by Dr. Sanz, consultative expert, in February 2017. 2017 x-rays and MRIs of the left ankle, left knee, and lumbosacral spine showed their progressive deterioration but not to the point of disability.

The ALJ found that Velásquez could do light work with some postural limitations, and should use a cane for outdoors, uneven terrain. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). Individuals capable of performing light work can also perform sedentary work, "unless there are additional limiting factors such as loss of fine dexterity

Velásquez III v. Commissioner of Social Security, Civil No. 20-1354 (BJM)    16

or inability to sit for long periods of time." *Id.* The ALJ found that Velásquez could sit for six hours and stand or walk for four hours in an eight-hour workday. Dr. Rivera, treating physician, assessed a less than sedentary RFC.[2] The severity of Velásquez's conditions as assessed by Dr. Rivera is not supported by this record because there are no evaluation notes or exam findings. However, Dr. Rivera's finding that Velásquez had severe left knee degenerative joint disease due to osteoarthritis, that he could not flex his left knee due to limited ROM, had to use a cane to keep balance and avoid injury of his left knee and ankle and a knee brace to support the knee joint, and that all other systems were normal goes in line with the consultative expert evidence. Dr. Sanz evaluated Velásquez in February 2017 and found left ankle edema and mild deformity. In his review of all systems, Dr. Sanz found that Velásquez had full strength and ROM, except for limited back and left knee flexion and left ankle flexion/extension. Dr. Sanz assessed that Velásquez could walk, stand, and sit. His gait was antalgic, protecting the left ankle and knee, and that he could walk without a cane. The cane was required for safety purposes due to left knee and ankle pain, which supports the ALJ's finding that Velásquez needed to use one on uneven terrain. He could also use both hands. Dr. Figueroa and Dr. Rodríguez, the state agency medical consultants, assessed a light RFC. Dr. Figueroa assessed that Velásquez required a cane for uneven terrains, as there was agency staff and investigator testimony and video evidence that Velásquez could walk straight and without a cane while on even ground. The Disability Determination Explanation includes an RFC finding for sedentary work. While the RFC determination pertains to the ALJ, the ALJ considered the assessments in the decision. Velásquez also self-reported, and was observed, being able to walk without a cane but limping when he didn't use it. The VE testified that with the ALJ's hypothetical questions, which reflects the ALJ's RFC assessment, a person like Velásquez would be able to perform less than a full range of light occupations, such as unskilled sedentary jobs. I conclude that the ALJ's RFC determination is supported by substantial evidence.

Velásquez's claim that the ALJ made improper medical conclusions is without merit as well. The ALJ is a lay person who is generally unqualified to interpret "raw, technical medical data." *Berríos v. Sec'y of Health & Human Servs.*, 796 F.2d 574, 576 (1st Cir. 1986). She may not substitute her "own impression of an individual's health for uncontroverted medical opinion."

---

[2] Sedentary work is defined as work that requires lifting no more than ten pounds at a time, sitting for at least six hours out of an eight-hour workday, occasional walking and standing for no more than about two hours a day, and good use of the hands and fingers for repetitive hand-finger actions. 20 C.F.R. § 404.1567(a); SSR 83-10.

However, an ALJ may render a common-sense judgment regarding an individual's capacities, so long as she "does not overstep the bounds of a lay person's competence and render a medical judgment." *Gordils v. Sec'y of Health & Human Servs.*, 921 F.2d 327, 329 (1st Cir. 1990). Here, the ALJ considered the treatment evidence and evidence by the State Agency medical consultants or psychological consultants, who "are highly qualified medical sources who are also experts in the evaluation of medical issues in disability claims under the Act" (SSR 17-2p). Along with other evidence in the record, the ALJ made her RFC determination.

Lastly, Velásquez questions the meaning of significant numbers in the national economy. ECF No. 19 at p. 8. The Commissioner considers "that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country" regardless of whether "(1) work exists in the immediate area in which you live; (2) [a] specific job vacancy exists for you; or (3) [y]ou would be hired if you applied for work." 20 C.F.R. § 404.1566(a). As already discussed, a RFC of light work with the additional limitations determined by the ALJ was appropriate, and the VE testified that there existed jobs in the national economy that Velásquez could perform. And, "[t]he judicial officer determines what constitutes a significant number of jobs." *Curtis v. Sullivan*, 808 F. Supp. 917, 926 (D.N.H. 1992) (c*iting Martínez v. Heckler*, 807 F.2d 771, 775 (9th Cir. 1986)). *See Vining v. Astrue*, 720 F. Supp. 2d 126, 136-138 (D. Me. 2010) (*quoting Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988) ("'[W]hen there is testimony that a significant number of jobs exists for which a claimant is qualified, it is immaterial that this number is a small percentage of the total number of jobs in a given area.'")

Ultimately, it is the Commissioner's responsibility to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts in the evidence (*see Ortiz*, 955 F.2d at 769 (citing *Rodríguez*, 647 F.2d at 222); *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 141 (1st Cir. 1987)). After thoroughly and carefully reviewing the record, I find that there is substantial evidence to support the ALJ's findings in this case.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 31st day of March, 2022.

*s/Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge
